## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Philadelphia Orchestra Association, | ) | Case No. 11-_____(___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Academy of Music of Philadelphia, Inc., | ) | Case No. 11-_____(___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Encore Series, Inc., | ) | Case No. 11-_____(___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

## DECLARATION OF RICHARD B. WORLEY
## IN SUPPORT OF FIRST DAY MOTIONS

I, Richard B. Worley, hereby declare under penalty of perjury:

1.     I am the Chairman of the Board of The Philadelphia Orchestra Association ("POA"), a Pennsylvania non-profit corporation and member of the Board of the Academy of Music of Philadelphia, Inc. ("AOM"), a Delaware corporation, each a debtor and debtor-in-possession in the above-captioned chapter 11 cases.  Debtor, Encore Series, Inc. ("ESI") is an affiliate of POA (collectively, POA, AOM and ESI are referred to herein as the "Debtors").  In this capacity, I am generally familiar with the Debtors' day-to-day operations, organizations and financial affairs, and books and records.

2.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code").   The Debtors are operating their organizations and managing

their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.   No request for the appointment of a trustee or examiner has been made in these chapter

11 cases, and no official committees have been appointed or designated.   Concurrently with the

filing of this declaration (the "Declaration"), the Debtors have sought procedural consolidation

and joint administration of these chapter 11 cases.

       3.      To enable the Debtors to minimize the adverse effects of the commencement of

these chapter 11 cases on their organizations, the Debtors have requested various types of relief

in their "first day" motions and applications (each, a "First Day Motion" and collectively, the

"First Day Motions").   The First Day Motions seek relief intended to allow the Debtors to

effectively transition into chapter 11 and minimize disruption of their operations, thereby

preserving and maximizing the value of the Debtors' estates.   I am familiar with the contents of

each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief

sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11

with minimal disruption or loss of productivity and value; (b) constitutes a critical element to

achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and

creditors' interests.

       4.      Except as otherwise indicated, all facts set forth herein are based upon my

personal knowledge of the Debtors' operations and finances, information learned from my

review of relevant documents, and information supplied to me by other members of the Debtors'

management and the Debtors' advisors.   I am authorized to submit this Declaration on behalf of

the Debtors, and, if called upon to testify, I could and would testify competently to the facts set

forth herein.

7219851_2

5.      Part I of this Declaration describes the Debtors' operations, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

## Background

### A.      Commencement of Chapter 11 Cases

6.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are operating their organizations and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Declaration, no official committees have been appointed or designated.  Concurrently with the filing of this Declaration, the Debtors have sought procedural consolidation and joint administration of these Chapter 11 Cases.

### B.      The Debtors' Corporate Structure

7.      The Debtors comprise three interlocking entities: (1) POA, a non-profit organization that operates The Philadelphia Orchestra (the "Orchestra"); (2) the AOM, a Delaware stock-issuing corporation whose shares are solely owned by POA; and (3) ESI, a non-profit organization that operates Peter Nero and The Philly Pops (the "Pops").

8.      AOM owns the Academy of Music facility (the "Academy") located at 1420 Locust Street, Philadelphia, PA, 19102, which is a historically certified structure that is encumbered by a long-term lease between AOM and the Kimmel Center, Inc. ("KCI").

9.      The Debtors operate their organizations at 260 South Broad Street, Philadelphia,

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

3

PA 19102.  Their information technology ("IT") services are operated out of office space at the

Academy House.  The Orchestra and Pops perform at the Academy, as well as at the Kimmel

Center for the Performing Arts (the "Kimmel Center"), a facility owned and operated by KCI.

POA is considered to be the anchor tenant of the Kimmel Center.

**C.      Overview and Nature of Debtors' Operations**

10.      The Orchestra, operated by POA, is among the world's leading orchestras.

Renowned for its artistic excellence since its founding in 1900, the Orchestra has inspired

audiences through thousands of live performances, recordings and broadcasts in Philadelphia and

around the world.  The Orchestra is also noted for its unprecedented record of innovation in

recording technologies and was both the first orchestra to appear on a national television

broadcast and was the first major orchestra to give a live cybercast of a concert on the internet.

11.      The Orchestra's presence is vital to Philadelphia's reputation and crucial to

Center City businesses and other cultural and educational institutions.  The Orchestra is the

anchor tenant of the Kimmel Center and a cornerstone of the Avenue of the Arts, and its

operations are estimated to create a more than $200 million ripple effect of economic activity as

well as state and local tax revenues.   Many of the Orchestra's musicians are teachers at the

Curtis Institute of Music (the "Curtis"), which is one of the finest conservatories in the world; the

Curtis, in turn, remains the source for many of the Orchestra's most talented musicians.

12.      Each year, the Orchestra performs locally, nationally and internationally.   In

Philadelphia, the Orchestra presents a major winter subscription each year from September to

May, in addition to education and community partnership programs, free concerts in local

neighborhoods and a summer outdoor season at The Mann Center for the Perfoming Arts.  The

Orchestra's annual national concert schedule includes performances at New York's Carnegie

Hall, the John F. Kennedy Center for the Performing Arts, the Bravo! Vail Valley Music Festival, and the Saratoga Performing Arts Center in upstate New York.  Each year, the Orchestra usually engages in a three-week international tour.

13.    POA also jointly owns and operates with KCI two entities:  Ticket Philadelphia ("TP") and a shared IT service department ("IT Shared Services").  By mutual agreement, POA includes all revenue and expense for IT Shared Services on its financial reports, while KCI includes all TP revenue and expense on its financial reports.

14.    POA is also financially obligated to support Peter Nero and The Philly Pops, a musical ensemble under the direction of Peter Nero ("Nero") and operated by Encore Series, Inc. ("ESI").  While the contract among POA, ESI and Nero permits POA to essentially take over ESI and appoint its Board of Directors, POA has elected not to do so; therefore, the relationship between POA and ESI remains contractually based.

15.    Allison Vulgamore, who joined the Orchestra in 2010, is the current President and Chief Executive Officer.  I serve as Chairman of the Board, which position I assumed in 2009. Together, Allison Vulgamore and I lead POA.  Musical direction for the Orchestra is currently provided by Chief Conductor Charles Dutoit, who was appointed to his post in 2009.  Starting in 2012, Yannick Nézet-Séguin will become the Orchestra's next Music Director.

16.    Joanna Lewis is the current President of AOM.  Allison Vulgamore is the President of ESI.  Mario Mestichelli serves as Chief Financial Officer for the Debtors.

17.    Like all other major orchestras, POA relies on a combination of earned, endowment and contributed income.  In a typical year, about one-third (1/3) of POA's total gross income is derived from earned income (ticket sales and fees for performances), one-quarter (1/4) comes from contributed income, and two-fifths (2/5) comes from income draws on the

5

endowment.  The rest of POA's revenue is derived from income from media ventures and other

earned income, including gross revenues from IT Shared Services and distributions from TP

operations.

18.    In an average year, about one-half (1/2) of POA's total expenses directly relate to

musician expense, including salary, pension, health insurance and other fringe benefits.  POA is

required under the terms of the current collective bargaining agreement to employ 105 musicians

and two librarians.  An additional one-third (1/3) of all expenses relates to other direct costs

incurred as part of the Orchestra's and Pops' performances, including fees for guest artists,

production costs and KCI rent.  The remainder of POA's budget covers all other operating

expenses, including marketing, development, IT Shared Services, staff salary and general

administration.

19.    The Orchestra's musicians are represented by Local 77 of the American

Federation of Musicians ("Local 77").  POA and Local 77 are parties to a collective bargaining

agreement that dictates terms and conditions of employment for the musicians.  The Orchestra's

musicians annually elect five musicians from the bargaining unit to represent their perspectives

with POA management and its board.

**D.    The Debtors' Capital Structure**

20.    AOM owns the Academy, which is encumbered by a lease with KCI pursuant to

which KCI pays AOM annual rent of $1.  The current lease term extends through June 15, 2026.

POA also owns a condominium in Rittenhouse Square, which was donated to POA and reverts to

the donor upon discontinuation of POA's operations, and office space in the Academy House.

None of these assets has been recently appraised.  The Debtors' assets also include periodic

distributions of income from various endowments.

6

21.    The Debtors' largest liabilities relate to employee expenses and accrued benefits obligations as well as liabilities relating to POA's two single-employer defined benefit plans and the AFM Plan (defined below).

**E.    Events Leading to the Commencement of the Chapter 11 Cases**

22.    In recent years, POA has experienced a series of challenges stemming from factors including declining ticket revenues, eroding endowment income, decreased donations, increased operational costs, increasing pension obligations and burdensome contractual agreements.  Similar trends have affected many cultural and artistic entities around the country. Indeed, many such entities over the past several years have ceased operations or sought bankruptcy protection.

23.    In POA's case, these trends have resulted in a widening structural deficit that now stands at a projected $14.5 million in FY 2011, which amounts to roughly one-third (1/3) of its $46 million annual budget.  This FY 2011 deficit size represents a significant increase from the Debtors' $7.1 million structural deficit in FY 2010.

24.    POA's main season revenues fell from $9.9 million in FY 2008 to $8.1 million in FY 2010, a drop of $1.8 million.  Ticket sales for the main season fell from 183,000 in FY 2008 to a projected 151,000 in FY 2010, a drop of 32,000 tickets.  Sales for POA's other concerts in the Philadelphia area show similarly troubling trends.  However, POA appears to be on track to achieve FY 2011 main season ticket sales at nearly the same levels as the FY 2010 results, which would mark the first time in four years that attendance has not declined.

25.    POA has endowments, which as of February 28, 2011 were valued at $116 million.  POA has, in recent years, drawn from the board-designated endowment at rates higher than the industry-standard level of 5.0 to 5.5% to help finance the deficit.  This excess spending

coupled with market losses on endowment has fully depleted the unrestricted portion of POA's

endowment.   Nearly all of the Debtors' remaining endowment funds can only be used for

designated purposes such as musician salaries, educational activities, innovation and technology,

renovations and other artistic purposes.   Because these designations are donor-imposed and

legally binding, the Debtors are not permitted to use these remaining funds to support general

operations or other liabilities.

26.    POA's declining donation level is the result of several trends.   First, POA has, for

many years, used funds from incoming unrestricted bequests to support operations rather than

more prudently investing them.   The level of these bequests has dropped off in recent years.

Gifts from individuals, corporations and foundations have also declined in recent years.   The

regular annual fund giving from POA board has declined slightly over the past year, but the

board recently donated an additional $9.25 million toward POA's recovery efforts.

27.    The Debtors believe that the revenue declines in earned, contributed and

endowment income are the result of both broader trends in the marketplace as well as Orchestra-

specific challenges.   The economic recession, stock market declines and increasingly crowded

entertainment market have all taken a toll.   However, POA also attributes some of these declines

to an aging audience and poor retention rates among new Orchestra patrons.

28.    POA's rising cost structure has also contributed to the widening deficit.   Between

FY 2000, when the Orchestra's main season was still held at the Academy of Music, and FY

2010, when the Orchestra was performing at the Kimmel Center, the Debtors' annual expense

base rose from $31.3 million to $43.6 million, a $12.3 million increase.

29.    Of this $12.3 million increase in annual expenses, $8.4 million represents an

increase in costs directly relating to musician expense, including salary, pension, health

7219851_2

insurance and other employee benefits.  This increase would have been even higher without the help of musicians, who provided a total of $7 million in collective bargaining agreement relief in two separate contract reopeners in FY 2010 and FY 2011.

30.    The remaining increases in annual POA expenses are attributable to:  a $1.4 million increase in hall occupancy costs; a $1.3 million increase in expenses related to an expansion of IT Shared Services that was largely offset by increased revenue; a $500,000 increase in development expenses that was more than offset by increased fundraising over the course of that decade; the remaining increase of $700,000 was due to a combination of other administrative costs, including employee health care.

31.    POA also faces an estimated total of at least $44.8 million (inclusive of anticipated withdrawal liability from the AFM Plan) in unfunded pension liabilities from its current pension plans now in place.  Due to market and interest rate declines and changes in regulations, which require greater rapidity of funding, POA's frozen defined benefit plan for musicians and its active defined benefit plan for staff are underfunded by an estimated $21.8 million.  To address the underfunded status of these plans, POA will be required to pay out an average of $2.18 million of cash payments annually from FY 2011 to FY 2020 above and beyond the cash expenses in the main operating budget.  Because these payments relate to obligations for prior service, these costs are not included in current income statements under accounting rules.  As an example, the $14.5 million projected structural deficit for POA's current FY 2011 operations does not include the $1.2 million in required cash contributions for these pension obligations for prior service for musicians and staff.

32.    When the musician defined benefit plan was frozen in October 2004, POA joined the American Federation of Musicians-Employers Pension Fund ("AFM Plan"), which is now in

critical status.  If POA withdrew from the AFM plan, it would be required to pay $23 million, given current actuarial assumptions.  While this liability could be lowered if market conditions improve, further market declines or withdrawal or failure of other employers in the plan could substantially increase this liability.  Because of their relationship with POA, AOM and ESI may be jointly liable for some of these liabilities, as well.

33.    At the time of the transition to the AFM Plan, POA offered a bridge benefit that was intended to be a temporary transition or "window" benefit that would guarantee that the move to the AFM Plan would not diminish retiring musicians' total pension benefit.  However, the promise of the bridge benefit was continued and expanded as part of the 2007 collective bargaining agreement.    POA's liability for this bridge benefit is part of the current collective bargaining negotiations; the total value of this liability is unclear at this point in time.

34.    POA and ESI, are also facing legal action initiated by Peter Nero and Finger Prince, Inc., who are seeking to enforce the terms of their existing contract with POA.  By contract, POA and ESI are required to present a season for the Pops and take full financial responsibility for any resulting deficits.  POA estimates that the Pops current 2010-2011 season will run an $800,000 deficit for FY 2011 alone, which is one of the factors driving the projected FY 2011 deficit of $14.5 million currently facing POA.  Given past deficits and that the Pops continues to show downward trends in attendance and donations, POA projects that these deficits and associated liabilities are likely to increase if a 2011-2012 Pops season is presented.

35.    Lastly, the Debtors' contractual relationships with KCI are also problematic.  POA's contract with KCI requires it to pay roughly $2.5 million annually, which, as noted earlier, is about $1.5 million higher than POA's occupancy costs at the Academy of Music.  While the leadership at KCI and AOM are supportive of POA at this critical time, the complex

contractual structure of these relationships does not appear to optimally serve the needs of all parties. For example, POA has become increasingly aware that customer service at Verizon Hall is critical to building long term relationships with its patrons, but this service is managed and provided by KCI, which has no immediate stake in POA's success.

36.     The governance structures underpinning KCI and POA's joint ownership of both TP and IT Shared Services are also not robust enough to manage expectations and financial arrangements on both sides.

37.     As POA's financial problems have become increasingly evident, POA has responded in the short term by cutting staff, reducing salaries of the remaining staff, and initiating the first of two reopeners of the collective bargaining agreement with Local 77. As new POA leadership came on board in 2010, POA initiated a second reopener and raised $15.5 million in funds to enable the Orchestra to continue performing. Of this sum, $9.25 million was contributed by the board above their normal annual giving of close to $2 million, and $6.25 million was contributed by other key stakeholders in the community.

38.     In parallel, POA took several steps aimed at resolving the long-term structural challenges. The first long-term track was to a strategic planning process that involved board, staff and musicians to diagnose the problems and develop a recovery plan. This process resulted in a strategic plan that focuses on increasing audiences by enhancing the concert experience and connecting patrons in fresh innovative ways to the music. The plan also focuses on encouraging more mutually beneficial partner relationships and placing POA on sound financial footing through changes in the revenue and expense structures.

39.     A second long-term track was to engage in early and substantial negotiations with Local 77 to reach a successor contract to the current collective bargaining agreement that expires

in September 2011.  Both the musicians and POA have worked diligently over the course of many months to reach agreement on a new contract.  While the musicians made substantial concessions – changes in work rules, size of complement, weeks of vacation, pension and pay – these concessions have not been sufficient to meet the needs of the recovery plan.  POA's bargaining agenda is born of necessity.  Specifically, the cost structure of POA must be reconciled with the precipitous decline in revenues, as detailed above.  Clearly, a $14 million dollar annual structural deficit is not sustainable.  While POA cannot realistically expect Local 77 to bridge the deficit entirely, the magnitude of the deficit is such that fundraising efforts have been rendered futile.  Absent a clear signal that POA is embarking upon a new era of austerity and financial stability, as evidenced by a collective bargaining agreement that embodies those principles, donations will continue to suffer, thereby exacerbating POA's problems even further.  Thus, a new collective bargaining agreement is critical to achieving both necessary structural expense reduction, as well as an impetus to reverse the decline in revenues.

40.    Once POA had progressed down both of these tracks, it opened discussions with major potential donors in an attempt to raise the funds necessary to continue operations and implement the plan.  POA's recent conversations with key donors indicate that, while they hold the Orchestra in high esteem, any gift for current operations or to support a turnaround would most likely be contingent on presenting a credible, cost-appropriate recovery plan that included a contract with the musicians that fostered long-term financial stability.

41.    Unfortunately, despite its efforts to date, the Debtors have depleted their remaining cash reserves and unrestricted endowments and projects that it will run out of cash in May 2011 barring any change in circumstances.

7219851_2

**F.      Desired outcomes for Chapter 11 process**

42.      Due to the Debtors' lack of liquidity, pension obligations and the many other issues listed above, the Debtors have made the difficult decision to file for chapter 11 protection. The Debtors believe that this is the path that will best allow them to secure the future of the Orchestra and ensure that it continues to serve the community for many more years to come.

43.      To that end, the Debtors seek in the chapter 11 process to achieve the following outcomes: (1) relief from pension obligations, (2) relief from current contractual obligations to Peter Nero and others, (3) renegotiated contractual agreements with KCI, (4) a new collective bargaining agreement with Local 77, and (5) a court-approved plan with all these elements that will attract donor support.

<u>**First Day Motions**</u>

**I.      Procedural Motions**

**A.      Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

44.      By the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly-administered cases under the case of The Philadelphia Orchestra Association.  Joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor.  Entry of an order directing joint administration of these cases will permit the Debtors to reduce fees and costs in connection with the administration of these cases by avoiding the duplication of efforts associated with, for

13

example, filing multiple duplicative documents in the Debtors' various individual cases, monitoring each of the Debtors' individual dockets and maintaining individual case files for each of the Debtors that will largely duplicate one another.  In addition, the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket.  Joint administration also will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee for the Eastern District of Pennsylvania will be simplified.

45.    The Debtors in these Chapter 11 Cases are affiliated entities.  The Debtors request that, in light of the fact that The Philadelphia Orchestra Association and its affiliates have each filed petitions in this Court, the Court can and should jointly administer the Chapter 11 Cases. Jointly administering these Chapter 11 Cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will simplify the United States Trustee's supervision of the administrative aspects of the Chapter 11 Cases.

## II.    Professional Retention and Related Motions

### A.    Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP as Counsel for the Debtors (the "Dilworth Retention Application")

46.    By the Dilworth Retention Application, the Debtors seek to retain Dilworth Paxson LLP ("Dilworth") as counsel pursuant to section 327(a) of the Bankruptcy Code as their attorneys because Dilworth has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Dilworth possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts in Pennsylvania.

14

47.     In preparing for its representation of the Debtors in these cases, Dilworth has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases.

48.     The Debtors believe that the employment of Dilworth is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession, and to implement the restructuring and reorganization of the Debtors.  Accordingly, the Debtors believe that Dilworth is both well-qualified and uniquely able to represent the Debtors in the Chapter 11 Cases in an efficient and timely manner.

## III.     Operational Motions

### A.     Motion of the Debtors for Entry of an Order Authorizing the Debtors to Continue Insurance Coverage Entered into Pre-Petition and Honor Obligations Related Thereto (the "Insurance Motion")

49.     In connection with the operation and management of their organizations, the Debtors maintain numerous insurance policies, providing coverage for, among other things, general liability, property damage, musical instruments, automobile liability, special accident liability, commercial crime, director and officer liability, and fiduciary liability (collectively, the "Insurance Policies").

50.     By the Insurance Motion, the Debtors request authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that payment is necessary or appropriate.

15

**B.      Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "<u>Utility Motion</u>")**

51.      In connection with the operation of their organizations, the Debtors obtain telephone, IT data protection, internet and other similar utility services provided by a number of utility companies (the "<u>Utility Providers</u>").   The Utility Providers service the Debtors' offices and performance venue in Philadelphia, Pennsylvania.   Certain of the Utility Providers also indirectly service other local performing arts non-profit organizations through the services provided to the Debtors, based on various shared services agreements.   Under these agreements, the Debtors share and provide telephone, internet, and other utility services to neighboring non-profits, remit payment to the Utility Providers, and receive reimbursements from the shared utility services recipients.   Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to promote, support and present scheduled concerts and other performances, thereby negatively impacting the Debtors' subscribership, donors, customers, revenues, and profits.   Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their operations and creditor recoveries.   It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.

52.      By the Utility Motion, the Debtors seek the entry of interim and final orders: (a) determining that their Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering,

16

refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by the Utility Motion.

C.    **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto (the "Customer Programs Motion")**

53.    To maintain its market share in the performing arts industry, the Debtors have dedicated extensive time and resources to developing a number of programs, including Subscriber Programs, Group Sales, Periodic Promotions and Marketing Initiatives, Gift Certificates, and Community Outreach and Development Programs (collectively, the "Customer Programs") to develop goodwill with their customers and subscribers. The Debtors believe their Customer Programs have been successful business strategies—the costs of the Customer Programs are largely offset by the revenue generated therefrom—and such programs play a critical role in the purchasing decisions of customers. As a result of the Customer Programs, the Debtors have established strong loyalty among their subscribers and donors.

54.    By the Customer Programs Motion, the Debtors seek entry of an order authorizing them, in their sole discretion, to (a) honor certain outstanding obligations (including, without limitation, discounts, rebates, promotions, special pricing or payment arrangements) earned by and owing to their patrons and subscribers under the Customer Programs, and (b) make payments to their customers in the ordinary course of business in satisfaction of certain accrued, pre-petition obligations incurred by the Debtors on account of their Customer Programs, in an amount not to exceed $1,000 in the aggregate. Additionally, the Debtors seek authority to

17

maintain and administer their Customer Programs in the ordinary course of business and in a manner consistent with past practice.

**D.      Motion of the Debtors for an Order Authorizing, But Not Directing, the Debtors to Enter Into Agreements With Critical Vendors and to Pay Pre-Petition Obligations in Connection Therewith (the "Critical Vendor Motion")**

55.      The Debtors operate in an industry where specialized services abound and many such services are critical.   The Debtors' critical vendors (the "Critical Vendors") primarily consist of (a) independent contractor artists, musicians, educators and teaching assistants, (b) consultant services facilitating advertising, marketing, and fundraising initiatives, (c) shared services and information technology vendors (d) music publishers, suppliers, and concert support providers, and (e) imminent logistical vendors.   Many of these vendors and the services derived from them cannot easily be replaced or replicated.   The goods and services provided by the Critical Vendors are crucial to the Debtors' orderly continuation of their business and would be difficult and expensive to replace.

56.      By the Critical Vendor Motion, the Debtors seek the entry of an Order, authorizing the Debtors to enter into agreements, if necessary, and further authorizing the Debtors to pay pre-petition amounts owed to the Critical Vendors described in the Critical Vendor Motion, which in the Debtors' reasonable judgment, are necessary to prevent the disruption of the Debtors' operations.

**E.      Motion of the Debtors for an Order (A) Authorizing the Debtors to Pay Certain Pre-petition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimburseable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Pre-petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wage Motion")**

18

57.     To minimize the personal hardship that the Debtors' employees would suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, by the Wages Motion, the Debtors seek authority to pay and honor, in their sole discretion, certain pre-petition claims for, among other items:  wages, salaries, commissions, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 403(b) contributions), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term and short-term disability coverage, floating holidays and all other benefits that the Debtors have historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

58.     Additionally, the Debtors request confirmation that the Debtors may, in their sole discretion, continue their pre-petition employee incentive programs in the ordinary course of business.  In an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during these chapter 11 cases in their sole discretion without the need for further Court approval.

**F.     Motion of the Debtors for Entry of an Order: (A) Authorizing the Debtors to (I) Continue Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Maintain Existing Investment Practices; and (B) Granting Post-petition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

59.     The Debtors seek entry of an order:  (a) authorizing the Debtors to (i) continue their Cash Management System, (ii) maintain their existing Bank Accounts and Business Forms and (iii) maintain their existing Investment Practices; and (b) granting post-petition

7219851_2

Intercompany Claims administrative expense priority.  The Debtors also request that the Court authorize the Debtors' banks to continue to maintain, service and administer the Bank Accounts. The Debtors request the Court authorize the banks to debit the Bank Accounts in the ordinary course of business on account of:  (a) all checks drawn on the Bank Accounts and which are cashed at the banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the Debtors' accounts with the banks prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtors were responsible for such items prior to the Petition Date and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the banks as service charges for the maintenance of the Cash Management System.

60.    The use of the Cash Management System is essential to enable the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balance and presentment information.  These controls are crucial given the significant volume of cash transactions managed through the Cash Management System.

**G.    Motion of the Debtors for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "<u>Case Management Motion</u>")**

61.    By the Case Management Motion, the Debtors seek entry of an order establishing certain notice, case management, and administrative procedures (the "<u>Case Management Procedures</u>"), which include the following:  (a) directing that matters requiring notice under

Bankruptcy Rule 2002(a)(2)–(6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and summonses); and (c) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court. The Debtors further request that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to these Chapter 11 Cases to the extent that they do not conflict with the Case Management Procedures.

Dated: 4/16/11                    By: *Richard B. Worley*
                                  Richard B. Worley
                                  Chairman of the Board of The Philadelphia Orchestra
                                  Association
                                  Member of Board of the Academy of Music of
                                  Philadelphia, Inc.

21