# **EXHIBIT A**

[DIP Credit Agreement]

[Execution Version]

# DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

between

## PHILADELPHIA ORCHESTRA ASSOCIATION,
*a Chapter 11 Debtor and Debtor-in-Possession*
*as Borrower*

and

## SUN FEDERAL CREDIT UNION,
*as Lender*

**September __, 2011**

## TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ...................................................................................................1

    1.1    **Certain Defined Terms**. .............................................................................1
    1.2    **Accounting Terms**. ...................................................................................7
    1.3    **Rules of Construction** .............................................................................7

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS......................7

    2.1    **Loans**. .......................................................................................................7
    2.2    **Interest on the Loan**. ...............................................................................8
    2.3    **Fees**. .........................................................................................................8
    2.4    **Repayments of Loans**. .............................................................................9
    2.5    **Use of Proceeds**. ...................................................................................10
    2.6    **Evidence of Debt; Register; Lender's Books and Records**. ..................10

SECTION 3. CONDITIONS TO LOAN ................................................................................10

    3.1    **Effectiveness**. ........................................................................................10

SECTION 4. REPRESENTATIONS AND WARRANTIES ...................................................11

    4.1    **Organization and Good Standing**. .......................................................12
    4.2    **Authorization and Power**. .....................................................................12
    4.3    **No Conflicts or Consents**. .....................................................................12
    4.4    **Enforceable Obligations**. ......................................................................12
    4.5    **No Liens**..................................................................................................12
    4.6    **Final Order**. ...........................................................................................12
    4.7    **No Default**. .............................................................................................12
    4.8    **Use of Proceeds**. ...................................................................................12
    4.9    **Principal Office, Etc**. .............................................................................12
    4.10    **Compliance with Law**. ..........................................................................12
    4.11    **Affiliates**. ...............................................................................................12
    4.12    **Collateral Documents; Description and Location of Assets**. ...............12
    4.13    **Public Utility Holding Company Act**. ...................................................12
    4.14    **Anti-Terrorism Laws**. ............................................................................13
    4.15    **Compliance with OFAC Rules and Regulations**...................................13
    4.16    **Financial Condition; No Material Adverse Change**. ............................13
    4.17    **Taxes**. .....................................................................................................14
    4.18    **Full Disclosure** ......................................................................................14

SECTION 5. AFFIRMATIVE COVENANTS .......................................................................14

    5.1    **Financial Statements and Other Reports**. ............................................14
    5.2    **Organizational Existence** .......................................................................15
    5.3    **Maintenance of Properties; Insurance**. .................................................15

5.4     Inspection; Books and Records. ...................................................................15
5.5     Payment of Obligations. .............................................................................15
5.6     Further Assurances. ....................................................................................15
5.7     Use of Proceeds. .........................................................................................15
5.8     Bankruptcy Information; Notices of Certain Events. ...............................15
5.9     Costs and Expenses. ...................................................................................16

SECTION 6. NEGATIVE COVENANTS ...............................................................................16

6.1     Indebtedness. .............................................................................................16
6.2     Liens and Related Matters. ........................................................................17
6.3     Changes in Fiscal Periods. .........................................................................17
6.4     Certain Payments. ......................................................................................17
6.5     Chapter 11 Claims. ....................................................................................17
6.6     Financial Covenants. ..................................................................................18

SECTION 7. EVENTS OF DEFAULT .....................................................................................18

7.1     Failure to Make Payments When Due. ......................................................18
7.2     Breach of Certain Covenants. ....................................................................18
7.3     Breach of Warranty. ...................................................................................18
7.4     Other Defaults Under Loan Documents. ...................................................18
7.5     Other Indebtedness. ...................................................................................18
7.6     Dissolution; Cessation of Business. ..........................................................18
7.7     Failure of Security; Repudiation of Obligations. ......................................18
7.8     Bankruptcy Matters. ..................................................................................19

SECTION 8. MISCELLANEOUS ...........................................................................................20

8.1     Assignments and Participations. ...............................................................20
8.2     Expenses. ...................................................................................................20
8.3     Indemnity. ..................................................................................................21
8.4     Set-Off. ......................................................................................................21
8.5     Amendments and Waivers. ........................................................................21
8.6     Independence of Covenants. ......................................................................22
8.7     Notices. ......................................................................................................22
8.8     Survival of Representations, Warranties and Agreements. ........................22
8.9     Failure or Indulgence Not Waiver; Remedies Cumulative. .......................22
8.10    Severability. ...............................................................................................22
8.11    Headings. ...................................................................................................22
8.12    Applicable Law. .........................................................................................22
8.13    Successors and Assigns. ............................................................................23
8.14    Consent to Jurisdiction and Service of Process. .......................................23
8.15    Waiver of Jury Trial. ..................................................................................23
8.16    Confidentiality. ..........................................................................................23
8.17    Maximum Amount. ....................................................................................24
8.18    Counterparts; Effectiveness. ......................................................................24
8.19    Patriot Act Notice. .....................................................................................24

SECTION 9. GRANT OF SECURITY, PRIORITIES AND LIENS; SURVIVAL OF CLAIMS ............24

**9.1**    **Grant of Security**. .................................................................................24
**9.2**    **Covenants Relating to Collateral**. ..........................................................25
**9.3**    **Remedial and Other Provisions**. .............................................................26
**9.4**    **No Discharge; Survival of Claims**. .........................................................27
**9.5**    **Superpriority**. ........................................................................................27

## EXHIBITS

A       FORM OF NOTICE OF BORROWING

## SCHEDULES

4.11        AFFILIATES

6.1(b)      EXISTING INDEBTEDNESS

9.1(b)      LOCATION OF PRINCIPAL PLACE OF BUSINESS, EQUIPMENT AND
REGISTERED INTELLECTUAL PROPERTY

[Execution Version]

## DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT is entered into as of September ___, 2011 by and between **PHILADELPHIA ORCHESTRA ASSOCIATION**, a Pennsylvania corporation ("**Borrower**"), as debtor and debtor-in-possession, and **SUN FEDERAL CREDIT UNION**, a Federal credit union ("**Lender**").

## RECITALS

**WHEREAS**, on April 16, 2011 (the "**Petition Date**"), Borrower filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "**Case**") with the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**") initiating the Case under Case Number 11-13098, and has continued in possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrower has advised Lender that it desires to continue in the operation of its business as a debtor-in-possession, and has requested that Lender make certain loans, advances and extensions of credit to or for its benefit during the pendency of the Case, all in order to meet Borrower's immediate and anticipated needs for funds for the payment of wages and to meet other current and immediate operating expenses of Borrower. To minimize the disruption of Borrower as a "going concern," Lender, under the terms and subject to the conditions set forth herein and in the instruments, agreements or documents referred to herein, hereby agree to make additional loans, advances and extensions of credit to or for the benefit of Borrower.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and intending to be legally bound hereby, Borrower and Lender agree as follows:

## SECTION 1.
## DEFINITIONS

**1.1**    **Certain Defined Terms**.    The following terms used in this Agreement shall have the following meanings:

"**Advance**" has the meaning given in Section 2.1(a).

"**Affiliate**", as applied to any Person, means any other Person directly or indirectly controlling, controlled by or under common control with that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreed Administrative Expense Priorities**" means (i) the unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), and (ii) amounts in respect of Carve-Outs.

"**Agreement**" means this Debtor-in-Possession Credit and Security Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"**Allowed Professional Fees**" means all fees of and expenses incurred by the professionals retained pursuant to Sections 327, 363, or 1103(a) of the Bankruptcy Code, by Borrower and any Committee in the Case provided for in the budgets (including, without limitation, a claims and notice agent) during the administration of the Case, in each case, as approved by the Bankruptcy Court. For the avoidance of doubt, the term "Allowed Professional Fees" does not include the fees and costs of professionals engaged by or for the benefit of Lender.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning assigned in the recitals to this Agreement.

"**Bankruptcy Plan**" means a plan of reorganization or liquidation for Borrower confirmed by final order of the Bankruptcy Court that provides for the payment in full of all of the Obligations or is otherwise consented to by Lender in its sole discretion.

"**Borrower**" has the meaning assigned to such term in the preamble to this Agreement.

"**Business Day**" means for all purposes, any day other than Saturday, Sunday and any day on which commercial banking institutions are required or authorized by Law to be closed in Philadelphia, Pennsylvania.

"**Capital Lease**" means any capital lease or sublease which would be capitalized on a balance sheet in accordance with GAAP.

"**Carve-Outs**" means the following: (a) the payment of Allowed Professional Fees that were incurred prior to an Event of Default or the Termination Date (whether approved and paid before or after such Event of Default or the Termination Date); (b) the payment of Allowed Professional Fees that were incurred after an Event of Default or the Termination Date in an amount not to exceed $500,000, minus any retainers still being held and available for application to such outstanding professional fees and expenses, provided that nothing herein shall be deemed a waiver of the rights of Lender to object to any requests for allowance of any such fees or expenses; and (c) fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court; provided, that nothing herein shall be deemed as a waiver of the rights of Lender to object to any requests for allowance of any fees or expenses.

"**Case**" has the meaning assigned in the recitals to this Agreement.

"**Closing Date**" means the date on which all of the conditions precedent to the making of the Loan has been met or waived by Lender.

"**Collateral**" has the meaning given in Section 9.l(a).

"**Collateral Documents**" means this Agreement and any mortgages, deeds of trust and other instruments or documents delivered by Borrower pursuant to this Agreement or any of the other Loan Documents in order to grant to Lender, a Lien on any real or personal property of Borrower as security for the Obligations.

"**Commitment**" means the commitment of Lender to make loans to Borrower pursuant to Section 2.1(a) in the aggregate amount of Three Million One Hundred Thousand Dollars ($3,100,000).

"**Committee**" means any official committee of unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in the Case.

"**Copyright Licenses**" means any written agreement naming any Grantor as licensor or licensee, granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"**Copyrights**" means (a) all copyrights arising under the Laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, and (b) the right to obtain all renewals thereof.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Extension**" means the making of a Loan.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Deposit Account**" has the meaning assigned in Section 6.6.

"**DIP Facility**" means the credit facility contemplated in this Agreement and other Loan Documents.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was maintained or contributed to by Borrower or any of their respective ERISA Affiliates.

"**Equipment**" has the meaning given in the UCC.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**Event of Default**" means each of the events set forth in Section 7.

"**Excluded Assets**" means (i) all temporarily and permanently restricted assets, either now held or subsequently acquired, of Borrower, as reported in the financial statements required to be delivered by Borrower pursuant to Section 5.1 hereof or identified as restricted on Schedules A and B of Borrower's bankruptcy schedules and any amendments thereto; (ii) all computer equipment and related software that is jointly owned with the Kimmel Center, Inc., and (iii) all payments received or receivable that are associated with, or attributable to, a performance that has not yet occurred.

"**Final Order**" means a final order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained herein and therein, on a first position, super-priority basis which order is not stayed.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower.

"**Funding and Payment Office**" means the office of Lender as set forth on the signature pages hereto.

"**Funding Date**" means the date of the funding of the Loan.

"**GAAP**" means generally accepted accounting principles of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board, which are used by Borrower in the preparation of their financial statements and are in effect from time to time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity, agency, division or subdivision thereof exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Grantor**" means Borrower.

"**Indebtedness**" means, as to any Person at a particular time, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than ninety (90) days after the date on which such trade account was created);

(d)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)     all Indebtedness in respect of Capital Leases of such Person; and

(f)     all guarantees of such Person in respect of any of the foregoing.

"**Indemnified Party**" has the meaning assigned to that term in <u>Section 9.3</u>.

-4-

"**Intellectual Property**" means all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign Laws or otherwise, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at Law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interest Payment Date**" means (i) the first day of each month, commencing on the first such date to occur after the Credit Date and (ii) the date when the Loans are repaid in full.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Laws**" means all applicable statutes, laws, treaties, ordinances, tariff requirements, rules, regulations, orders, writs, injunctions, decrees, judgments, opinions or interpretations of any Governmental Authority.

"**Lender**" has the meaning assigned in the preamble to this Agreement.

"**Loan Documents**" means this Agreement, the Collateral Documents, and any related instruments, certificates, and agreements entered into from time to time by Borrower for the benefit of Lender.

"**Loan**" means the loan made by Lender to Borrower pursuant to Section 2.1(a).

"**Notes**" has the meaning assigned in Section 2.1(d).

"**Notice of Borrowing**" means a notice substantially in the form of **Exhibit A** annexed hereto delivered by Borrower to Lender pursuant to Section 2.1(b) with respect to a proposed borrowing.

"**Obligations**" means all obligations of every nature of Borrower from time to time owed to Lender under the Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Patent License**" means all agreements, whether written or oral, providing for the grant by or to Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

"**Patents**" means (a) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"**Patriot Act**" means the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001, as amended.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business or statutory trusts or other organizations, whether or not legal entities, and governments (whether federal, state or local,

domestic or foreign, and including political subdivisions thereof) and agencies or other administrative or regulatory bodies thereof.

"**Petition Date**" has the meaning assigned in the recitals to this Agreement.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, controller, vice president or secretary of Borrower, but in any event, with respect to financial matters, the chief financial officer or controller of Borrower.

"**Sanctioned Country**" means a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement /ofac/sanctions/index.html, or as otherwise published from time to time.

"**Sanctioned Person**" means (a) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time, or (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, or (iii) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"**Subject Real Property**" (a) that certain real property situated at 1420 Locust Street, Suite 320, Philadelphia, Pennsylvania, and, in each case, all improvements thereon.

"**Tax**" or "**Taxes**" means any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and all interest, penalties or similar liabilities with respect thereto; provided that "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its lending office).

"**Termination Date**" means the earliest of the following: (a) [April 16, 2012]; (b) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the sixtieth (60th) day after the date of entry of the confirmation order; (c) acceleration by Lender of the Obligations due to the occurrence of an Event of Default; or (d) the indefeasible payment in full of all Obligations owing under the DIP Facility in accordance with the terms hereof.

"**Thirteen-Week Forecast**" means the "POA Thirteen-Week Cash Forecast" as updated from time to time pursuant to Section 5.1(d).

"**Trademark License**" means any agreement, whether written or oral, providing for the grant by or to Grantor of any right to use any Trademark.

"**Trademarks**" means all trademarks, trade names, corporate or other organizational entity names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and (b) all applications in

connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided that if, with respect to any financing statement or by reason of any mandatory provisions of Law, the perfection or the effect of perfection or non-perfection of the security interests granted to Lender pursuant to this Agreement is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than the Commonwealth of Pennsylvania, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement and any financing statement or other document relating to such perfection or effect of perfection or non-perfection.

**1.2    Accounting Terms.**    Except as otherwise expressly provided herein, all accounting and financial terms used in the Loan Documents and the compliance with each financial covenant therein shall be determined in accordance with GAAP, and all accounting principles shall be applied on a consistent basis so that the accounting principles in a current period are comparable in all material respects to those applied during the preceding comparable period. If Borrower or Lender determines that a change in GAAP, from that in effect on the date hereof, has altered the treatment of certain financial data to its detriment under this Agreement, such party may, by written notice to the other not later than ten (10) days after the effective date of such change in GAAP, request renegotiation of the financial covenants affected by such change. If Borrower and Lender have not agreed on revised covenants within thirty (30) days after delivery of such notice, then, for purposes of this Agreement, GAAP will mean generally accepted accounting principles on the date just prior to the effective date of the change in GAAP that gave rise to the renegotiation.

**1.3    Rules of Construction.**    Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References to "sections" and "subsections" shall be to sections and subsections, respectively, of this Agreement unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

**SECTION 2.**
**AMOUNTS AND TERMS OF COMMITMENTS AND LOANS**

**2.1    Loans.**

(a)    **Loan Commitment.** Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties of Borrower herein set forth, Lender agrees to make loans to Borrower in the aggregate principal amount of the Commitment (individually and collectively, the "**Loan**"). The Loan shall be structured as two separate advances: one for $2,000,000 and another for $1,100,000 (each, an "**Advance**").

(b)    **Borrowing Mechanics.** The request for an Advance hereunder shall be made by a notice in the form attached hereto as **Exhibit A** from Borrower to Lender (a "**Notice of Borrowing**"), given not later than 12:00 P.M. (Philadelphia time) on the Business Day on which the proposed

borrowing is requested. The Notice of Borrowing shall be given by telecopy setting forth (1) the requested date of such borrowing, (2) certification by Borrower that they have complied in all respects with Section 3.1, and (3) the account at which such requested funds should be made available.

(c) **Disbursement of Funds**. Promptly after receipt by Lender of the Notice of Borrowing pursuant to Section 2.1(b), Lender shall make the requested amount available not later than 11:00 A.M. (Philadelphia time) on the Funding Date, in immediately available funds in Dollars, at the Funding and Payment Office. Upon satisfaction or waiver of the conditions precedent specified in Section 3.1, Lender shall make the proceeds of the Loan available to Borrower on the Funding Date by causing an amount of immediately available funds in Dollars to the account of Borrower at the Funding and Payment Office.

(d) **Notes**. The obligations to repay the Loan and to pay interest thereon shall be evidenced by a promissory note of Borrower to Lender, in form and substance acceptable to Lender (the "**Note**"), payable to the order of Lender in a principal amount equal to the Commitment and representing the Obligations of Borrower to pay Lender the amount of the Commitment or, if less, the aggregate unpaid principal amount of all Loans made by Lender hereunder, plus interest accrued thereon, as set forth herein. Borrower irrevocably authorizes Lender to make or cause to be made appropriate notations on the Note, or on a record pertaining thereto, reflecting the Loan and repayments thereof. The outstanding amount of the Loan set forth on the Note or such record shall be prima facie evidence of the principal amount thereof owing and unpaid to Lender, but the failure to make such notation or record, or any error in such notation or record shall not limit or otherwise affect the obligations of Borrower hereunder or under the Note to make payments of principal of or interest on the Note when due.

**2.2    Interest on the Loan**.

(a) **Rate of Interest on Loan**. Subject to the provisions of Sections 2.3(c) the Loan shall bear interest on the unpaid principal amount thereof from the date made until repaid and the interest rate shall be seven and one-quarter percent (7¼%) on the outstanding balances of the Loan owing to Lender at the close of business for each day during each calendar month.

(b) **Post-Default Interest**. To the extent permitted by Law, upon the occurrence and during the continuance of an Event of Default, all Obligations shall bear interest from the date of such Event of Default and during the continuance thereof at the rate of nine and one-quarter percent (9¼ %) per annum (the "**Default Rate**") until paid. Such interest shall be due and payable on demand.

(c) **Computation of Interest**. Interest on the Loan shall be computed on the basis of a 360-day year, for the actual number of days elapsed in the period during which it accrues. All interest rate determinations and calculations by Lender are conclusive and binding absent manifest error.

(d) **Payment of Interest**. Except as otherwise set forth herein, interest on each Loan shall be payable in arrears, in immediately available funds, (i) on each Interest Payment Date applicable to the Loan; and (ii) upon any prepayment of the Loan, whether voluntary or mandatory, to the extent accrued on the amount being paid.

**2.3    Fees**.

(a) **Administrative Fee**. Borrower shall pay to Lender on the Closing Date, for its sole account, an administrative fee in the amount of $15,500 in total for the two loans (the "**Administrative Fee**").

(b)    **Audits and Appraisals Fee**.  With respect to those inspections and collateral audits conducted under Section 5.4, Borrower shall pay for the separate account of Lender, audit, appraisal, and valuation fees and charges, and out-of-pocket expenses for each financial, collateral and other audit or investigation of Borrower performed by personnel employed by Lender, and actual charges paid or incurred by Lender if it elects to employ the services of one or more third Persons to perform such services.

(c)    **Fees Earned**.  All fees payable to Lender by Borrower hereunder or pursuant to any other agreement executed in connection herewith shall be fully earned when due hereunder or thereunder and shall be non-refundable in all circumstances.

## 2.4    Repayments of Loans.

(a)    **Prepayments of the Loan**.

(i)    Voluntary Prepayments of the Loan.  Borrower may, upon prior written or telephonic notice given to Lender by 12:00 noon (Philadelphia time) on the date of the proposed prepayment and, if given by telephone, promptly confirmed in writing to Lender, at any time and from time to time prepay the Loan on any Business Day in whole or in part in an aggregate minimum amount of $50,000 and integral multiples of $50,000.  Notice of prepayment having been given as aforesaid, the principal amount of the Loan specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied to reduce the outstanding principal balance of the Loan.

(ii)    Mandatory Prepayments.

(A)    Borrower shall from time to time repay the Loans to the extent necessary so that the outstanding principal Obligations shall not at any time exceed the amount contemplated by this Agreement.

(B)    All mandatory prepayments of the Loans shall be allocated first to any accrued and unpaid interest through the date of such prepayment and second to the Loans.

(b)    **Repayment of Loan**.  Borrower agrees to repay in full all outstanding principal amounts of the Loan, and the Commitment shall automatically terminate and be permanently reduced to zero, on the Termination Date.

(c)    **General Provisions Regarding Payments**.

(i)    Manner and Time of Payment.  All payments by Borrower of principal, interest, fees and other Obligations hereunder shall be made in Dollars in immediately available funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Lender not later than 1:00 P.M. (Philadelphia time) on the date due at the Funding and Payment Office for the account of Lender; funds received by Lender after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(ii)    Payments on Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

**2.5**    **Use of Proceeds**. The proceeds of the Loan shall be used solely in accordance with (i) the Final Order, (ii) to fund working capital requirements of Borrower, operating expenses of Borrower and capital expenditures, in the ordinary course of business of Borrower subsequent to the commencement of the Case, including Allowed Professional Fees during the administration of the Case, to the extent permitted hereby, (iii) to fund the payment of interest accrued on the Loan, and (iv) to pay the fees and expenses of Lender relating to the DIP Facility and the Case, including, without limitation, its diligence and administrative fees and costs, and reasonable attorney's, appraisers' and other professional advisors' and consultants' fees and costs.

**2.6**    **Evidence of Debt; Register; Lender's Books and Records**.

**(a)**    **Lender's Evidence of Debt.** Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to Lender, including the amounts of the Loan made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect Lender's Commitment or the Borrower's Obligations in respect of the Loan; and provided further that, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

**(b)**    **Register.** Lender shall maintain at its Principal Office a register for the recordation of the Loans from time to time (the "**Register**"). The Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice. Lender shall record in the Register the Commitment and the Loan, and each repayment or prepayment in respect of the principal amount of the Loan, and any such recordation shall be conclusive and binding on Borrower and Lender, absent manifest error; provided, that failure to make any such recordation, or any error in such recordation, shall not affect Lender's Commitment or Borrower's Obligations in respect of the Loan. Borrower hereby designates Lender to serve as Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.6.

**SECTION 3.**
**CONDITIONS TO LOAN**

**3.1**    **Effectiveness**. This Agreement shall not become effective, and Lender shall not be obligated to make the Loan unless Lender has received the following (each, unless otherwise noted, dated or effective on the Closing Date):

**(a)**    **Documentation**.

(i)    Copies of the articles of incorporation and bylaws of Borrower, certified as of the Closing Date by a Responsible Officer of Borrower;

(ii)    Resolutions of the Executive Committee Board of Directors or other governing body of Borrower approving and authorizing the execution, delivery and performance of the Loan Documents, and the borrowings made hereunder, each in form and substance satisfactory to Lender, certified as of the Closing Date by a Responsible Officer of Borrower as being in full force and effect without modification or amendment;

(iii)    Signature and incumbency certificates of the officers of Borrower executing the Loan Documents to which it is a party which certificates shall be executed by a Responsible Officer of Borrower; and

(iv)    Executed originals of each Loan Document to which Borrower is a party.

**(b)    Final Order**.  Entry of a Final Order by the Bankruptcy Court within thirty (30) days following entry of an order approving the DIP Facility, which Final Order shall not have been modified or amended without approval of Lender, and shall not have been reversed or stayed pending appeal, and shall otherwise be in form and substance satisfactory to Lender.

**(c)    Fees**.  Borrower shall have paid to Lender the fees required to have been paid by the Closing Date pursuant to Section 2.3 hereof and an amount equal to the estimated reasonable costs and out-of-pocket expenses of Lender's counsel incurred in connection with the preparation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby.

**(d)    Mortgages**.  Lender shall have received first priority mortgages on the Subject Real Property, each in form and substance satisfactory to Lender covering the Subject Real Property, issued by an insurer and otherwise in form and substance satisfactory to Lender;

**(e)    Insurance**.  Lender shall have received evidence of hazard and liability insurance acceptable to Lender to be maintained at all times naming as lender/loss payee, additional insured and mortgage, as its interests may appear; and

**(f)    Conditions Precedent**.  After giving effect to the Loan:

(i)    **No Default**.  There exists no Default or Event of Default;

(ii)    **Notice of Borrowing**.  Lender shall have received from Borrower a Notice of Borrowing in accordance with Section 2.1(b) and all of the statements contained in such Notice of Borrowing shall be true and correct; and

(iii)    **Updated Thirteen-Week Forecast**.  Lender shall have received the Thirteen-Week Forecast most recently required to have been delivered pursuant to Section 5.1, in form and substance satisfactory to Lender and Borrower are in compliance therewith.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to make the Loans, Borrower represents and warrants to Lender, on the date of this Agreement and on each Funding Date that the following statements are true, correct and complete:

**4.1    Organization and Good Standing**. Borrower is a corporation duly organized and in good standing under the Laws of the State of its organization and has the corporate power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates.

**4.2    Authorization and Power**. Borrower has full power and authority to execute, deliver and perform the Loan Documents to which it is a party, all of which have been duly authorized by all proper and necessary corporate action.

**4.3    No Conflicts or Consents**. Neither the execution and delivery of the Loan Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and provisions thereof, will contravene or materially conflict with any provision of Law to which Borrower is subject, any license, or permit applicable to Borrower, any indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument binding on Borrower or any provision of the charter, or bylaws, regulations, or other organizational documents of Borrower. No consent, approval, authorization or order of any court, Governmental Authority, member, stockholder or third party is required in connection with the execution, delivery or performance by Borrower of any of the Loan Documents, other than entry and continued effectiveness of the Final Order.

**4.4    Enforceable Obligations**. The Loan Documents have been duly executed and delivered by Borrower, and are the valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

**4.5    No Liens**. Other than Liens permitted pursuant to Section 6.2, all of the properties and assets of Borrower are free and clear of all Liens and other adverse claims of any nature, and such persons have good and marketable title to such properties and assets owned or purported to be owned.

**4.6    Final Order**. As of the date of the making by Lender of the Loan hereunder, the Final Order has been entered and has not been stayed, amended, reversed, vacated, rescinded or otherwise modified (except in accordance with the terms hereof) in any respect.

**4.7    No Default**. No event has occurred and is continuing which constitutes a Default or an Event of Default.

**4.8    Use of Proceeds**. The proceeds of the Loans will be used by Borrower in accordance with the Final Order and Section 2.5.

**4.9    Principal Office, Etc**. The principal office, chief executive office, principal place of business and jurisdiction of formation of Borrower are set forth on Schedule 9.l(b) hereto.

**4.10    Compliance with Law**. Borrower is in compliance in all material respects with all Laws which are applicable to Borrower, or its properties.

**4.11    Affiliates**. Each Affiliate of Borrower is set forth on Schedule 4.11 hereto.

**4.12    Collateral Documents; Description and Location of Assets**. The Collateral Documents contain a description of all of the Collateral sufficient to grant to Lender perfected Liens therein pursuant to applicable Law.

**4.13    Public Utility Holding Company Act**. Borrower is not a "public utility holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended (the

"**1935 Act**"), nor does the execution, delivery and performance of this Agreement and the Note require any filing, authorization or consent under the 1935 Act.

**4.14** **Anti-Terrorism Laws.** Borrower is not (a) an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (b) in violation of (i) the Trading with the Enemy Act, as amended, (ii) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (iii) the Patriot Act; and (c)(i) is a blocked person described in section 1 of the Anti-Terrorism Order or (ii) to the best of Borrower's knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

**4.15** **Compliance with OFAC Rules and Regulations**.  Borrower (i) is not a Sanctioned Person, (ii) does not have any of its assets in Sanctioned Countries, or (iii) does not derive any of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Countries. No part of the proceeds of any of the Loans will be used directly or indirectly to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

**4.16** **Financial Condition; No Material Adverse Change**.

(a)    Borrower has heretofore furnished to Lender (a) the consolidated audited and consolidating balance sheet and statements of income, total members' equity and cash flows of Borrower as of and for the fiscal years ended August 31, 2010 and August 31, 2009, each as certified without qualification by Grant Thornton LLP.  Such financial statements present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of Borrower and its consolidated Affiliates, as of such date and for such periods in accordance with GAAP.

(b)    Borrower has heretofore furnished to Lender the Thirteen-Week Forecast for the period beginning September __, 2011, and ending _____, 2011.  Such projections represent the estimates of management of Borrower regarding future performance, based upon historical financial information and reasonable assumptions.

(c)    (i) Each financial statement and report delivered pursuant to Section 5.1 presents fairly, in all material respects, the consolidated financial position and results of operations and cash flows of Borrower and its consolidated Affiliates, or other information covered by such report, as of such date and for such periods covered thereby in accordance with GAAP and (ii) each budget and forecast delivered pursuant to Section 5.1 represents the estimates of management of Borrower regarding future performance, based upon historical financial information and reasonable assumptions.

**4.17    Taxes**. All federal, state and local income and franchise and other material tax returns, reports and statements, if any (collectively, the "**Tax Returns**") required to be filed by Borrower have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all taxes, charges and other impositions reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of Borrower in accordance with GAAP. As of the Closing Date, no Tax Return is under audit or examination by any Governmental Authority and no written notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority.

**4.18    Full Disclosure**. None of the representations or warranties made by Borrower in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of Borrower in connection with the Loan Documents contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

## SECTION 5.
## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, so long as any part of the Commitment hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, unless Lender shall otherwise give prior written consent, Borrower shall perform all covenants in this Section 5.

**5.1    Financial Statements and Other Reports**. Borrower will maintain a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP, consistently applied, and in the manner in which they have been historically prepared. Borrower will deliver to Lender:

(a)    as soon as available, but in any event not later than one-hundred twenty (120) days after the end of the fiscal year of Borrower, the consolidated and consolidating balance sheets of Borrower and its consolidated Affiliates as at the end of such fiscal year and the related consolidated statements of income, total members' equity and cash flows for such fiscal year, audited by a certified public accounting firm acceptable to Lender, and setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as true, correct and complete and fairly representing the financial performance and condition of Borrower and its consolidated Affiliates;

(b)    as soon as available, but in any event not later than thirty-one (31) days after the end of each quarterly period of each fiscal year of Borrower, the unaudited consolidated and consolidating balance sheets of Borrower and its consolidated Affiliates as at the end of such quarter and the related unaudited consolidated statements of income and net assets for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, as true, correct and complete and fairly representing the financial performance and condition of Borrower and its consolidated Affiliates (subject to normal year-end audit adjustments);

(c)    as soon as available and in any event within thirty-one (31) days after the close of each of the monthly accounting periods in each fiscal year of Borrower, the monthly operating reports as at the end of such monthly period, certified by a Responsible Officer as true, correct and complete;

(d)    each week, an updated Thirteen-Week Forecast, which shall be satisfactory in form and substance to Lender; and

(e)    together with each delivery described in Section 5.1(d) above, a variance report satisfactory in form and substance to Lender, which variance report will show a comparison of actual revenues received and payments made by Borrower in the immediately preceding period to the comparable budgeted line items reflected in the Thirteen-Week Forecast.

**5.2    Organizational Existence**  Borrower will at all times preserve and keep in full force and effect its corporate existence and all rights and franchises material to the business of Borrower.

**5.3    Maintenance of Properties; Insurance**.  Borrower will maintain or cause to be maintained in good repair, working order, and condition, ordinary wear and tear excepted, all material properties used or useful in the business of Borrower and from time to time will make or cause to be made all appropriate repairs, renewals, and replacements thereof.  Borrower will maintain, with financially sound and reputable insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses.

**5.4    Inspection; Books and Records**.  Borrower shall keep and maintain satisfactory and adequate books and records of account in accordance with GAAP and permit Lender (through any of their respective officers, employees, or agents) from time to time, and so long as there shall exist no Default or Event of Default, with reasonable prior written notice to Borrower and during normal business hours, to inspect and reproduce (at Borrower's expense) Borrower's books and records and to check, test, and appraise (at Borrower's expense) the Collateral, in order to verify Borrower's financial condition or the amount, quality, value, condition of, or any other matter relating to the Collateral; provided that, to the extent that the Termination Date shall not have occurred and there shall exist no Default or Event of Default, any such audits and inspections shall occur during normal business hours and upon notice to Borrower.

**5.5    Payment of Obligations**.  Borrower will pay the Obligations in accordance with the terms and provisions of the Loan Documents.

**5.6    Further Assurances**.  At any time or from time to time upon the request of Lender, Borrower will, at its expense, promptly execute, acknowledge, and deliver such further documents and do such other acts and things as Lender may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement and the other Loan Documents.  In furtherance and not in limitation of the foregoing, Borrower shall take such actions as Lender may reasonably request from time to time to ensure that the Obligations are secured in accordance with the Collateral Documents and this Agreement.

**5.7    Use of Proceeds**.  Borrower shall use the proceeds of the Loans only in accordance with in Section 2.5.

**5.8    Bankruptcy Information; Notices of Certain Events**.

(a)    Promptly after the same is available, Borrower shall furnish to counsel for

-15-

Lender (to the addresses set forth on the signature pages hereto or such other address as to which Borrower has received notice under Section 8.7) all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Case, or distributed by or on behalf of Borrower to any official committee appointed in the Case.

      **(b)**     Notify Lender in writing immediately:

          (i)     of the institution of any litigation, the commencement of any administrative proceedings, the happening of any event or the assertion or threat of any claim which would have a material and adverse effect on the operations of Borrower;

          (ii)     the occurrence of any Default or Event of Default; or

          (iii)     in detail of any actual or alleged failure to comply with or perform, breach, violation or default under any applicable local, state and federal laws or regulations or under the terms of any of such franchises or licenses, grants of authority, or of the occurrence or existence of any facts or circumstances which with the passage of time, the giving of notice or otherwise would create such a breach, violation or default or would occasion the termination of any of such franchises or grants of authority; and

      **5.9**    **Costs and Expenses.**   Pay or reimburse Lender for all out-of-pocket costs and expenses (including but not limited to attorneys' fees and disbursements) Lender may pay or incur in connection with the preparation, negotiation and review of this Agreement and the other Loan Documents, the investigation and diligence conducted in connection therewith, and all waivers, consents and amendments in connection therewith and all other documentation related thereto, the making of the Loan hereunder, and the collection, administration or enforcement of the same, including without limitation any fees and disbursements incurred in defense of or to retain amounts of principal, interest or fees paid, audits , appraisals, inspections, insurance and other similar fees and costs.  All obligations provided for in this Section 5.9 shall survive any termination of this Agreement or the Commitment and the repayment of the Obligations.

**SECTION 6.**
**NEGATIVE COVENANTS**

      Borrower covenants and agrees that, so long as any part of the Commitment hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, unless Lender shall otherwise give prior written consent, Borrower shall perform all covenants in this Section 6.

      **6.1**    **Indebtedness.**   Borrower shall not apply to the Bankruptcy Court for authority to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

      **(a)**     Indebtedness of Borrower pursuant to any Loan Document; and

      **(b)**     Indebtedness of Borrower existing on the Closing Date set forth on Schedule 6.1(b).

-16-

**6.2**   **Liens and Related Matters**.   Borrower shall not, directly or indirectly, create, incur, assume or permit to exist any Liens on or with respect to the Collateral of any kind, whether now owned or hereafter acquired, except:

(a)   Liens granted under the Collateral Documents to Lender on the Collateral;

(b)   statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue; or (ii) for amounts that are overdue and that are being diligently contested in good faith by appropriate proceedings, or, with respect to Borrower, as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court;

(c)   Liens for Taxes not yet due and payable or are diligently contested in good faith by appropriate proceedings promptly instituted and diligently conducted;

(d)   Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations;

(e)   easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the value or use of the property to which such Lien is attached;

(f)   licenses of patents, trademarks and other intellectual property rights granted by Borrower in the ordinary course of business consistent with past practice and not interfering in any respect with the ordinary conduct of the business and not adversely affecting the value of such intellectual property; and

(g)   Liens existing on the date hereof.

**6.3**   **Changes in Fiscal Periods**.   Borrower shall not change its method of determining fiscal years or quarters.

**6.4**   **Certain Payments**.   Except as permitted in the Final Order and other than applications to the Bankruptcy Court for authority to make any such payments upon, and in connection with, the confirmation of a Bankruptcy Plan, Borrower shall not, nor shall it apply to the Bankruptcy Court for authority to, make any non-ordinary course payments, other than (a) non-ordinary course payments contemplated by the first day orders (and any related final orders with respect thereto) and (b) the payment of cure amounts in connection with the assumption of contracts approved by the Bankruptcy Court and approved and consented to by Lender.

**6.5**   **Chapter 11 Claims**.   Except for the Carve-Outs or as otherwise provided in the Collateral Documents, Borrower shall not, nor shall it apply to the Bankruptcy Court for authority to, incur, create, assume, suffer to exist or permit any other super-priority claim or Lien which is *pari passu* with or senior to the claims of Lender granted pursuant to the Loan Documents, other than, with respect to post-petition assets of Borrower, Liens permitted under Section 6.2 hereof.

**6.6**    **Financial Covenants**.  Borrower shall maintain an account (the "**Deposit Account**") with Lender and at all times have an aggregate amount of cash and cash equivalents of not less than $250,000 in such Deposit Account.  If Borrower elects to draw the second Advance, the minimum amount of cash and cash equivalents in the Deposit Account shall increase to $350,000.

## SECTION 7.
## EVENTS OF DEFAULT

If any of the following conditions or events ("**Events of Default**") shall occur:

**7.1**    **Failure to Make Payments When Due**.

Failure by Borrower to pay any installment of principal of, or interest on, any Loan or any fees, indemnity obligations or other amounts payable under the Loan Documents or any other obligation when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, and, in the case of payments of interest, fees, indemnity obligations or other non-principal amount, such failure shall continue unremedied for three (3) or more days after receipt of notice from the Lender of the amount thereof.

**7.2**    **Breach of Certain Covenants**.  Failure of Borrower to perform or comply with any term or condition contained in Section 5.2, Section 5.4, Section 6 or Section 9.2(a) of this Agreement.

**7.3**    **Breach of Warranty**.  Any representation, warranty, certification or other statement made by Borrower in any Loan Document or in any statement or certificate at any time given by Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or misleading in any material respect on the date when made or deemed made.

**7.4**    **Other Defaults Under Loan Documents**.  Borrower shall default in the performance of or compliance with any term contained in this Agreement or any of the other Loan Documents, other than any such term referred to in any other section of this Section 7, and such default shall not have been remedied or waived within ten (10) Business Days after the earlier of (a) the date Borrower knew or should have known of such Default, or (b) the date of notice thereof by Lender to Borrower.

**7.5**    **Other Indebtedness**.  Borrower shall default in the payment or performance of any obligation to another person or entity, either singly or in the aggregate in respect of post-Petition Indebtedness in an amount in excess of $100,000, whether now outstanding or hereafter incurred.

**7.6**    **Dissolution; Cessation of Business**.  Any order, judgment or decree shall be entered against Borrower decreeing the dissolution of Borrower; or any cessation of a substantial part of the business of Borrower for a period which materially and adversely affects the ability of Borrower to continue its business on a profitable basis as determined by Lender in its sole and absolute discretion; or the determination of Borrower, whether by vote of Borrower's board of directors or otherwise, to suspend the operation of Borrower's business in the ordinary course, or the filing of a motion or other application in the Case, seeking authority to do any of the foregoing.

**7.7**    **Failure of Security; Repudiation of Obligations**.  At any time after the execution and delivery thereof, (a) any Collateral Document shall cease to be in full force and effect or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected first priority Lien in any collateral purported to be covered thereby, in each case for any reason other than the failure of Lender to take any action within its sole and exclusive control and as to which Borrower provided true, correct,

-18-

complete and timely information necessary to effect same; (b) Borrower shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under any Loan Document to which it is a party; or (c) Borrower shall contest the perfection, priority or enforceability of any lien, mortgage or security interest granted to Lender.

### 7.8    Bankruptcy Matters.

(a)    **Dismissal.** (i) The Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in the Case, or (iii) an examiner having enlarged powers relating to the operation of the business of Borrower (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed.

(b)    **Final Order Stayed.** (i) An order of a court of competent jurisdiction shall be entered reversing, staying, or rescinding the Final Order; or (ii) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Final Order without the written consent of Lender.

(c)    **Challenge of Certain Claims.** Any attempt by Borrower, to obtain, or if any such Party or any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Lender's claims, liens or line or claim priority status, or to subject Lender's collateral to any surcharge pursuant to Sections 506(c), 552(b), or 105(a) of the Bankruptcy Code.

(d)    **Relief from Stay.** An order shall be entered granting relief from the automatic stay permitting foreclosure of any assets of Borrower in excess of $100,000 in the aggregate from and after the Closing Date, unless such relief is sought by Lender.

(e)    **Certain Motions.** Except for the Carve-Outs, Borrower shall file any pleading seeking, or otherwise consenting to, or the entry of an order of the Bankruptcy Court effecting (i) the invalidation, subordination or otherwise challenging the Liens and super-priority claim status granted to secure the Obligations hereunder; (ii) the invalidation or subordination, in whole or in part, of the Liens or the super-priority claim status of the Obligations hereunder; (iii) the confirmation of a Plan which does not (A) contain a provision for pre-payment in full in cash of all obligations of Borrower to Lender on or before the effective date of such plan or such sale upon entry thereof and (B) provide for the continuation of the liens, security interests and priorities granted to Lender for the benefit of Borrower until such Plan's effective date; (iv) administrative priority equal or superior to the priority of the claims and liens of Lender for any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) except as expressly permitted pursuant to this Agreement; or (v) the grant of a lien on any collateral securing the DIP Facility, except as expressly permitted pursuant to this Agreement.

(f)    **Final Determination.** The Bankruptcy Court or any other court having jurisdiction over Borrower makes a final determination with respect to any motion or proceeding brought by any Person which results in the material impairment of the rights of Lender under any of the Loan Documents.

THEN upon the occurrence and during the continuation of any Event of Default, after five (5) Business Days written notice to Borrower and the Committee, but without further order of or application to the Bankruptcy Court, Lender shall be entitled to, by written notice to Borrower, (i) declare all or any portion of the principal of, interest on, and other amounts payable on the Loans, and all or any portion of the other

-19-

Obligations to be, and the same shall forthwith become, immediately due and payable; (ii) terminate the Commitment and the obligation of to make any Loan or Advance; (iii) enforce all of the Liens and security interests created pursuant to this Agreement, the Collateral Documents and/or the Final Order; (iv) apply any cash collateral held by Lender to the repayment of the Obligations; (v) setoff amounts in bank accounts maintained with Lender, or otherwise enforce rights against any other Collateral in the possession of Lender; (vi) liquidate the Collateral without the requirements of seeking any further relief form the automatic stay under the Bankruptcy Code (which relief has been expressly granted pursuant to the Final Order); and/or (vii) take any other action or exercise any other right or remedy of Lender under any of the Loan Documents, the Final Order or applicable Law.

## SECTION 8.
## MISCELLANEOUS

**8.1**    <u>**Assignments and Participations**</u>.

(a)    The provisions of this Agreement, including <u>Section 9</u>, shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrower may not, except as otherwise permitted under the Loan Documents, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender and in no event may Lender assign or otherwise transfer any of its rights or obligations hereunder except in accordance with the provisions of <u>Section 8.1(b)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Affiliates of Lender) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

(b)    Lender may at any time assign to one or more Persons approved by Borrower (such approval not to be unreasonably withheld or delayed) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment); <u>provided</u> that the parties to each assignment shall execute and deliver an Assignment and Assumption, together with a processing and recordation fee of $3,500, and the assignee shall deliver such information as Lender shall reasonably request. From and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 2.4</u>, <u>7</u>, and <u>8</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.

(c)    Lender, acting solely for this purpose as an agent of Borrower, shall maintain at the Funding and Payment Office, a copy of each Assignment and Assumption delivered to it and the names and addresses of any new Lender and the Loans owing to such Lender.

**8.2**    <u>**Expenses**</u>. Whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to pay, within five (5) Business Days following Borrower's receipt of a request from Lender to make such payments, (a) all the actual and reasonable costs and expenses of Lender in connection with the preparation of the Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of Borrower's performance of and compliance with all agreements and conditions on its part to be performed or complied with under this Agreement and the other Loan

Documents including with respect to confirming compliance with environmental and insurance requirements; (c) the reasonable fees, expenses and disbursements of counsel and financial advisors to Lender in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (d) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Lender pursuant to any Collateral Document, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, and reasonable fees, expenses and disbursements of counsel to Lender; and (e) all the costs incurred by Lender in connection with the enforcement of Borrower's performance of and compliance with all agreements and conditions on its part to be performed or complied with under this Agreement and the other Loan Documents. Notwithstanding the foregoing, for the period from the Petition Date to the date of occurrence of an Event of Default, Borrower's obligations under this Section 9.2 shall be subject to the limitations set forth in the Final Order.

**8.3    Indemnity. BORROWER AGREES TO INDEMNIFY AND HOLD HARMLESS LENDER, AND ITS RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS, AND ADVISORS (EACH, AN "INDEMNIFIED PARTY") FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL CLAIMS), COSTS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES) THAT MAY BE INCURRED BY OR ASSERTED OR AWARDED AGAINST ANY INDEMNIFIED PARTY, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR BY REASON OF (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION, OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THE NEGOTIATION AND CONSUMMATION OF THE DIP FACILITY, THE LOAN DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE LOANS, EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE IS FOUND IN A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S NEGLIGENCE OR WILLFUL MISCONDUCT. IN THE CASE OF AN INVESTIGATION, LITIGATION, OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS SECTION 8.3 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION, OR PROCEEDING IS BROUGHT BY BORROWER, ITS DIRECTORS, MEMBERS, OR CREDITORS OR AN INDEMNIFIED PARTY OR ANY OTHER PERSON OR ANY INDEMNIFIED PARTY IS OTHERWISE A PARTY THERETO. WITHOUT PREJUDICE TO THE SURVIVAL OF ANY OTHER AGREEMENT OF BORROWER HEREUNDER, THE AGREEMENTS AND OBLIGATIONS OF BORROWER CONTAINED IN THIS SECTION 8.3 SHALL SURVIVE THE PAYMENT IN FULL OF THE LOANS AND ALL OTHER AMOUNTS PAYABLE UNDER THE LOAN DOCUMENTS.**

**8.4    Set-Off.** If an Event of Default exists, Lender shall be entitled to exercise the rights of offset and/or banker's Lien against each and every account and other property, or any interest therein, which Borrower may now or hereafter have with, or which is now or hereafter in the possession of, Lender to the extent of the full amount of the Obligations.

**8.5    Amendments and Waivers.** No amendment, modification, termination or waiver of any provision of this Agreement, and no consent to any departure by Borrower therefrom, shall in any event be effective without the written consent of Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on

Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

**8.6    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**8.7    Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service or upon receipt if sent by telefacsimile or by the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the address of each party hereto shall be as set forth under such party's name on the signature pages hereof.

**8.8    Survival of Representations, Warranties and Agreements**.

(a)    **Representations and Warranties**.  All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

(b)    **Continuing Obligations**.  Notwithstanding anything in this Agreement or implied by Law to the contrary, the agreements of Borrower set forth in Sections 2.4, 5.9, 8.2, 8.3 and 8.4 and the agreements of Lender set forth in Section 8.2 shall survive the payment of the Loans, the cancellation or expiration of any letter of credit supported by DIP Facility proceeds and the reimbursement of any amounts drawn thereunder, and the termination of this Agreement.

**8.9    Failure or Indulgence Not Waiver; Remedies Cumulative**.  No failure or delay on the part of Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**8.10    Severability**.  In case any provision in or obligation under this Agreement or any Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**8.11    Headings**.  Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.12    Applicable Law**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**8.13    Successors and Assigns**. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lender (it being understood that Lender's rights of assignment are subject to Section 8.1). Borrower may not assign its rights or delegate its obligations hereunder or any interest herein without the prior written consent of Lender.

**8.14    Consent to Jurisdiction and Service of Process**. ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY OBLIGATIONS THEREUNDER, MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE CITY OF PHILADELPHIA, PENNSYLVANIA. BY EXECUTING AND DELIVERING THIS AGREEMENT, BORROWER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS;* (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO BORROWER AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.7; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER BORROWER IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE PROVISIONS OF THIS SECTION 8.14 RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAWS.

**8.15    Waiver of Jury Trial**. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.

**8.16    Confidentiality**. Lender shall hold all non-public information obtained pursuant to the requirements of this Agreement which has been identified as confidential by Borrower in accordance with Lender's customary procedures for handling confidential information of this nature and in accordance with prudent lending or investing practices, it being understood and agreed by Borrower that in any event Lender shall be permitted to disclose such information (a) to Affiliates of Lender or disclosures reasonably required by any actual or potential assignee, transferee or participant in connection with the contemplated assignment or transfer by Lender of its Loans or any participations therein; provided that such actual or potential assignee, transferee or participant agrees in writing to be bound by the provisions of this Section 8.16, (b) to such of its respective officers, directors, employees, agents, affiliates and representatives as need to know such information, (c) to the extent requested by any regulatory authority, (d) to the extent otherwise required by applicable Laws and regulations or by any subpoena or similar legal process or disclosures, (e) in connection with any suit, action or proceeding relating to the enforcement of its rights hereunder or under any other Loan Document or (f) to the extent such

-23-

information (i) is or becomes publicly available other than as a result of a breach of this Section 8.16 or (ii) is or becomes available to Lender on a nonconfidential basis from a source other than Borrower.

**8.17    Maximum Amount.**

(a)    **Maximum Amount.**    Regardless of any provision contained in any Loan Document, Lender shall not be entitled to contract for, charge, take, reserve, receive, or apply, as interest on all or any part of the Obligations, any amount in excess of the maximum rate permitted by applicable Law (the "**Maximum Amount**"), and, if Lender ever does so, then such excess shall be deemed a partial prepayment of principal and treated hereunder as such and any remaining excess shall be refunded to Borrower.    In determining if the interest paid or payable exceeds the maximum rate permitted by applicable Law, Borrower and Lender shall, to the maximum extent permitted under applicable Law, (i) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the Obligations.

(b)    **Application of Excess.**    If under any circumstances Lender shall receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the applicable Loans and shall be treated as a voluntary prepayment under Section 2.4(a), or if such amount exceeds the unpaid balance of the applicable Loans and any other Indebtedness of Borrower in favor of Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Borrower.

**8.18    Counterparts; Effectiveness.**    This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and Lender of written or telephonic notification of such execution and authorization of delivery thereof.

**8.19    Patriot Act Notice.**    Lender hereby notifies Borrower that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**SECTION 9.**
**GRANT OF SECURITY, PRIORITIES AND LIENS; SURVIVAL OF CLAIMS**

**9.1    Grant of Security.**

(a)    **Grant of Security Interest.**    Grantor hereby grants to Lender, a security interest in the following property now owned or at any time hereafter acquired by Grantor or in which Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations:

(i)    all Equipment (including musical instruments);

(ii)    all Intellectual Property;

-24-

(iii)    the Subject Real Property;

(iv)    all books and records pertaining to the Collateral;

(v)    all assets (other than the Excluded Assets), including but not limited to general intangibles, negotiable collateral, the musical library (which shall include sheet music) and all property listed on Schedules A and B of Grantor's bankruptcy schedules and any amendments thereto; and

(vi)    to the extent not otherwise included, all proceeds of any and all of the foregoing.

**(b)    Representations and Warranties Relating to Collateral**. To induce Lender to enter into this Agreement and to make its extensions of credit to Borrower hereunder, Grantor hereby represents and warrants to Lender that:

(i)    On the date hereof, Grantor's jurisdiction of organization and the location of Grantor's chief executive office or sole place of business are specified on <u>Schedule 9.1(b)</u>;

(ii)    On the date hereof, the Equipment (other than any Equipment in transit) is kept at the locations listed on <u>Schedule 9.1(b)</u>; and

(iii)    (A) <u>Schedule 9.1(b)</u> lists all registered Intellectual Property and all other material Intellectual Property owned by Grantor in its own name on the date hereof, (B) on the date hereof, all material Intellectual Property of Grantor described on <u>Schedule 9.1(b)</u> is valid, subsisting, unexpired and enforceable, has not been abandoned and does not infringe on the intellectual property rights of any other Person, (C) except as set forth in <u>Schedule 9.1(b)</u>, on the date hereof, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which Grantor is the licensor or franchisor, and (D) no action or proceeding is pending, or, to the knowledge of Grantor, threatened, on the date  hereof seeking to limit, cancel or question the validity of any material Intellectual Property or Grantor's ownership interest therein, or which, if adversely determined, would have a material and adverse effect on the value of such Intellectual Property.

**9.2    <u>Covenants Relating to Collateral</u>**. Grantor covenants and agrees with Lender that, from and after the date of this Agreement until the Obligations shall have been paid in full:

**(a)    Payment of Obligations**. Grantor will pay and discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all post-petition taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of income or profits therefrom, as well as all claims of any kind (including, without limitation, claims for labor, materials and supplies) against or with respect to the Collateral, except that no such charge need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings, reserves in conformity with GAAP with respect thereto have been provided on the books of Grantor and deposited with Lender and such proceedings would not reasonably be expected to result in the sale, forfeiture or loss of any material portion of the Collateral or any interest therein.

**(b)    Maintenance of Perfected Security Interest; Further Documentation**. Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in the Final Order and shall defend such security interest against the claims and demands of all Persons whomsoever.

(i)    Grantor will furnish to Lender from time to time statements and schedules further identifying and describing the assets and property of Grantor and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail.

(ii)    At any time and from time to time, upon the written request of Lender, and at the sole expense of Grantor, Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC (or other similar Laws) in effect in any jurisdiction with respect to the security interests created hereby.  In furtherance of the foregoing, Borrower hereby authorizes Lender, to file any Uniform Commercial Code financing or continuation statement reasonably deemed necessary or appropriate by Lender, without the signature of Borrower, to the extent permitted by applicable law.  Borrower ratifies any filing by Lender as aforesaid, with respect to the Collateral.

(c)    **Changes in Locations, Name, etc**.  Grantor will not, except upon thirty (30) days' prior written notice to Lender and delivery to Lender of (i) all additional financing statements and other executed documents reasonably requested by lender to maintain the validity, perfection and priority of the security interests provided for herein and (ii) if applicable, a written supplement to <u>Schedule 9.1(b)</u> showing any additional location at which Equipment shall be kept:

(i)    permit any of the Equipment to be kept at a location other than those listed on <u>Schedule 9.1(b)</u>;

(ii)    change its jurisdiction of organization or the location of its chief executive office or sole place of business from that referred to in <u>Section 9.1(b)(i)</u>; or

(iii)    change its name, identity or organizational structure to such an extent that any financing statement filed by Lender in connection with this Agreement would become misleading.

(d)    **Notices**.  Grantor will advise Lender promptly, in reasonable detail, of:

(i)    any Lien (other than security interests created hereby or Liens permitted under this Agreement) on any of the Collateral; and

(ii)    the occurrence of any other event which would reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or would adversely affect the security interests created hereby.

**9.3    <u>Remedial and Other Provisions</u>**.

(a)    **Application of Proceeds**.  At such intervals as may be agreed upon by Borrower and Lender, or, if an Event of Default shall have occurred and be continuing, at any time at Lender's election, Lender may apply all or any part of proceeds constituting Collateral in payment of the Obligations in the following order:

<u>First</u>, to pay incurred and unpaid fees and expenses of Lender under the Loan Documents;

Second, to Lender, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations;

Third, to Lender, for application by it towards prepayment of the Obligations; and

Fourth, any balance of such proceeds remaining after the Obligations shall have been paid in full, and the Commitment shall have terminated shall be paid over to Borrower or to whomsoever may be lawfully entitled to receive the same.

(b)    **Code and Other Remedies**.  If an Event of Default shall occur and be continuing, Lender, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the UCC or any other applicable Law.  Without limiting the generality of the foregoing, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by Law referred to below) to or upon Grantor (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by Law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Grantor, which right or equity is hereby waived and released.  Grantor further agrees, at Lender's request, to assemble the Collateral and make it available to lender at places which Lender shall reasonably select, whether at Grantor's premises or elsewhere.  Lender shall apply the net proceeds of any action taken by it pursuant to this Section 9.3(b), after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any provision of Law, including, without limitation, Section 9-615(a)(3) of the UCC, needs Lender account for the surplus, if any, to Grantor.  If any notice of a proposed sale or other disposition of Collateral shall be required by Law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(c)    **Waiver; Deficiency**.  Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by Lender to collect such deficiency.

9.4    **No Discharge; Survival of Claims**.  Borrower agrees that to the extent its Obligations hereunder are not satisfied in full, (a) its Obligations arising hereunder shall not be discharged by the entry of a confirmation order (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the super-priority claim granted to Lender pursuant to the Final Order and the Liens granted to Lender pursuant to the Final Order shall not be affected in any manner by the entry of a confirmation order.

9.5    **Superpriority**.Grantor hereby agrees that this Agreement shall constitute allowed administrative expenses in the Bankruptcy Case, and pursuant to section 364(c)(1) of the Bankruptcy Code, shall have priority over any and all administrative expenses of any kind and nature specified in

section 503(b) or 507(b) of the Bankruptcy Code, subject only to the prior payment of the Agreed Administrative Expense Priorities, as and to the extent set forth in the Final Order or any subsequent order of the Bankruptcy Court.

[Signature Page Follows]

[Execution Version]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers hereunto duly authorized as of the date first written above.

**BORROWER:**

PHILADELPHIA ORCHESTRA ASSOCIATION

By: _Marie Mistichelli_

Name: Marie Mistichelli

Title: VP & CFO

<u>Notice Address for Borrower:</u>

Philadelphia Orchestra Association
260 South Broad Street, 16th Floor
Philadelphia, PA 19103
Attention:   Chief Financial Officer
Facsimile:  (215) 893-3139

with copies to:

Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19103
Attention:  Larry McMichael
Facsimile:  (215) 575-7200
Email:  lmcmichael@dilworthlaw.com

and

Reed Smith LLP
2500 One Liberty Place
1650 Market Street, Suite 3500E
Philadelphia, PA 19103
Attention:  Claudia Z. Springer
Facsimile:  215-851-1420
Email:  cspringer@reedsmith.com

**LENDER:**

SUN FEDERAL CREDIT UNION

By: _____
Name: Dale S. Frankhouse, Jr.
Title: Director of Business Services

Notice Address:

Sun Federal Credit Union
1625 Holland Road
Maumee, OH 43537
Attn: Dale S. Frankhouse, Jr.
Tel: 419-794-7420
Fax: 419-893-4809
Email: dale.frankhouse@sunfcu.org

with a copy to:

Weltman, Weinberg & Reis
965 Keynote Circle
Brooklyn Heights, OH 44131
Attn: Alan Hochheiser & Geoffrey Peters
Tel: 216-739-5649
Fax: 216-739-5680
Email: ahochheiser@weltman.com;
          gpeters@weltman.com

Funding and Payment Office Address:

Sun Federal Credit Union
1625 Holland Road
Maumee, OH 43537
Attn: Dale S. Frankhouse, Jr.
Tel: 419-794-7420
Fax: 419-893-4809